## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JAMES HARLAN and CARMAN ANGE,**
**as the natural parents and heirs at law of**
**CURTIS HARLAN, deceased, and as**
**Special Administrators of the Estate of**
**Curtis Harlan, deceased,**

      **Plaintiffs,**

**v.**

**UNITED FIRE AND CASUALTY**
**COMPANY,**

      **Defendant.**

**Case No. 14-cv-02419-DDC-JPO**

## MEMORANDUM AND ORDER

Plaintiffs James Harlan and Carman Ange filed this breach of contract action on behalf of themselves, as the natural parents and heirs of Curtis Harlan, and as Special Administrators to the Estate of Curtis Harlan. Curtis Harlan's former employer, R.A. Knapp Construction, Inc. ("R.A. Knapp"), maintained a Commercial General Liability Policy of Insurance (the "Policy") with defendant United Fire and Casualty Company ("United"). R.A. Knapp employed Curtis Harlan as a member of its crew when a car struck and killed him while he was operating a device known as a "Georgia Buggy" near Topeka, Kansas, on Interstate 470 ("I-470").

Plaintiffs allege that the Georgia Buggy Curtis was operating when the accident happened was a covered "auto" under the Policy. Because the driver of the car that killed Curtis was underinsured, plaintiffs seek to recover benefits under the Policy's uninsured-motorist coverage. On February 5, 2015, United filed a motion for summary judgment. Doc. 24. The court denied United's motion, granting plaintiffs' request for more time to conduct discovery. Doc. 36.

Plaintiffs conducted more discovery, taking two additional depositions, and United timely filed this Motion for Summary Judgment (Doc. 40).  Here, as in its original motion for summary judgment, United asserts that the accident did not trigger the Policy's uninsured-motorist coverage because Curtis Harlan was not operating an *auto* as the Policy defines that term.  And because the Georgia Buggy wasn't an auto, United contends, the court should grant its Motion for Summary Judgment against plaintiffs' breach of contract claim.  For the reasons explained below, the court grants United's Motion for Summary Judgment.

I.      **Legal Standard**

Summary judgment is appropriate when the moving party demonstrates that there is "no genuine dispute" about any material fact and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Houser*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of

evidence to support the non-movant's claim." *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings but must bring forward specific facts showing a genuine issue for trial [about] those dispositive matters for which it carries the burden of proof." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## II.   Uncontroverted Facts

The facts below either are uncontroverted or, where controverted, are stated in the light most favorable to plaintiffs, the parties opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).[1]

In the early morning hours of August 5, 2012, an R.A. Knapp crew was patching and repaving parts of I-470 near Topeka, Kansas. At that location, I-470 is a four-lane divided highway. The crew was working on the right-hand lane of the two southbound lanes, and had used orange cones to close off the construction zone, which included the right-hand lane and shoulder. Plaintiffs' son, Curtis Harlan, was working as part of that crew. His job was to drive a

[1] "All material facts set forth are deemed to be admitted for the purpose of summary judgment unless specifically controverted." *Powers v. Tweco Prods., Inc.*, 206 F. Supp. 2d 1097, 1103 (D. Kan. 2002) (citing *Gullickson v. Sw. Airlines Pilots' Ass'n*, 87 F.3d 1176, 1183 (10th Cir. 1996)). Plaintiffs assert that they have controverted United's statements of fact in paragraphs 20, 22, 34, and 36, but plaintiffs' assertions do not specifically respond to or address United's stated facts. The court thus deems United's statements of fact in paragraphs 20, 22, 34, and 36 uncontroverted.

Georgia Buggy (the "Buggy") carrying concrete sealant from patch-to-patch to finish the newly poured concrete.  Around 6 a.m., Curtis backed the Buggy out of the construction zone and into the active lane of traffic.  A passing car hit the Buggy and Curtis Harlan and he died from his injuries.

The driver of that car had insurance, but plaintiffs allege that it is not enough to cover their damages.  So, they turned to R.A. Knapp's insurance policy with United.  Under that Policy's uninsured-motorist-coverage endorsement (the "Uninsured Endorsement"), United agreed to pay "all sums the 'insured' is legally entitled to recover as damages from the owner or driver of an" uninsured or underinsured vehicle.  Doc. 41-9 at 1, Uninsured Endorsement Part A.1.  The Uninsured Endorsement defines *insured* as "[a]nyone 'occupying' a covered 'auto'."  Doc. 41-9 at 2, Uninsured Endorsement Part B.2.  To determine what a *covered auto* is, one must look at the Policy's business-auto-coverage endorsement (the "Business Endorsement").  Doc 41-10, Business Endorsement.  The Business Endorsement defines an *auto* as:

1. A land motor vehicle, "trailer" or semitrailer designed for travel on public roads, or

2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment[.]"

Doc. 41-10 at 10, Business Endorsement Part V.B.  After an investigation and referencing this definition of *auto*, United denied plaintiffs' request for benefits under the Uninsured Endorsement.  United contends that the Georgia Buggy that Curtis Harlan was operating when he was killed was not an *auto* as defined in the Business Endorsement.  So, United asserts that Curtis Harlan was not an insured under the Uninsured Endorsement.

4

The Georgia Buggy Curtis Harlan was driving when he died was a small vehicle used principally off public roads. It rested on three wheels in a tricycle-like alignment and was operated by controls mounted on handlebars. The Buggy had no lights, windshield, mirrors, turn signals, or enclosed driving compartment. Indeed, to operate the Buggy, the driver had to stand on a narrow platform and hold the Buggy's handlebars to steer and help keep himself upright. In front of the driver, the Buggy had a platform to hold materials. When the accident occurred, that platform held a large plastic vat of compound used to cure concrete. The Buggy was not registered with the Kansas Department of Motor Vehicles.

### III.    Analysis

United contends that the Buggy was not a covered auto under R.A. Knapp's policy with United because it was not designed to travel on public roads, is not subject to any Kansas compulsory-insurance law, and is, in fact, best categorized as mobile equipment. And so, because the Buggy was not an auto, United contends that it did not breach the Policy by denying plaintiffs' request for coverage.

### A.    Travel on Public Roads

United contends that the undisputed facts establish that the Buggy is not a vehicle designed for use on public roads. This matters, United asserts, because the Buggy cannot meet the first definition of *auto* under the Policy if it was not designed for use on public roads.

In support of its argument, United points to the Buggy's lack of road-worthy features: the Buggy did not have lights, a windshield, turn signals, mirrors, or an enclosed passenger compartment. Also, the Buggy's operator was exposed completely—he stood on a narrow platform while driving the Buggy using hand controls affixed to bicycle-like handlebars. None of these features resembles a vehicle designed for use on public roads. Indeed, the absence of

lights, turn signals, and mirrors violates Kansas's vehicle-safety laws, making the Buggy unfit for use on public roads in the state.  Kan. Stat. Ann. §§ 8-1705–06, -1708(b), -1740.  As Kansas law requires a vehicle designed for use on public roads to include all of those features, the Buggy's lack of them is telling.

In light of its design features, the court holds that no basis exists for a reasonable jury to find that the Buggy was designed for travel on public roads.  Accordingly, United has shown that the Buggy is not an auto under section V, part B.1 of the Business Endorsement.

### B.    Kansas Compulsory-Insurance Laws

United next contends that the undisputed facts also establish that the Buggy is not subject to any Kansas compulsory-insurance law.  This matters, United asserts, because it precludes any possibility that the Buggy could meet the second definition of *auto* under the Policy.

The Kansas Automobile Injury Reparations Act requires every owner of a motor vehicle to secure liability insurance coverage for the vehicle.  Kan. Stat. Ann. § 40-3104(a).  The Act defines *motor vehicle* as "every self-propelled vehicle of a kind *required to be registered* in this state, including any trailer, semitrailer or pole trailer designed for use with such vehicle, but such term does not include a motorized bicycle."  *Id.* § 40-3103(m) (emphasis added).  So the court must look to Kansas's vehicle registration laws.

Kansas law requires registration of all "motor vehicle[s] . . . intended to be operated upon any highway in [Kansas] . . . except as otherwise provided by law."  *Id.* § 8-127(a).  The registration statute broadly defines *motor vehicle* as "every vehicle . . . which is self-propelled."  *Id.* § 8-126(u).  But, Kansas Statutes Annotated § 8-128 specifically exempts several kinds of motor vehicles from registration and § 8-198 exempts all non-highway and salvage vehicles from registration.  If the Buggy fits one of these exemptions, then it is not a "vehicle of a kind

required to be registered" and is therefore not subject to Kansas's compulsory-insurance law. *See Gonzales v. Shelter Mut. Ins. Co.*, No. 15-cv-1199-JTM, 2016 WL 2736083, at *3 (D. Kan. May 11, 2016) (concluding that ATV was not subject to Kansas compulsory insurance laws because it was specifically exempted from registration under Kan. Stat. Ann. § 8-128); *Lemen v. 21st Century Nat'l Ins. Co.*, No. 107,438, 2012 WL 4795637, at *7–8 (Kan. Ct. App. Oct. 5, 2012) (stating that a motor bike may not be subject to Kansas registration laws if it was manufactured for non-highway use and therefore exempt under Kan. Stat. Ann. § 8-128(a)); *Kresyman v. State Farm Mut. Ins. Co.*, 623 P.2d 524, 526 (Kan. Ct. App. 1981) (noting that "statutory provisions within the motor vehicle laws and the act provide exceptions and exemptions" to registration and compulsory insurance laws).[2]

United asserts that the Buggy is exempt from registration as a non-highway vehicle under § 8-198. The statute defines *nonhighway vehicle* as, among other things, "[a]ny motor vehicle which cannot be registered because it is not manufactured for the purpose of using the same on the highways of this state and is not provided with the equipment required by state statute for vehicles of such type which are used on the highways of this state." Kan. Stat. Ann. § 8-197(b)(1)(A)(i). The Kansas Court of Appeals interprets this definition as having two parts:

---

[2] Kan. Stat. Ann. § 8-198(a) states, in relevant part, that "[a] nonhighway or salvage vehicle shall not be required to be registered in this state, as provided in K.S.A. 8-135, and amendments thereto." Section 8-135 sets out the process used to register a vehicle as well as some rules about which vehicles must be registered. It is § 8-127(a), however, that states the broad rule that motor vehicles intended for highway use must be registered. Though one could read the non-highway vehicle exemption statute, § 8-198(a), to provide an exception to the registration process outlined in § 8-135, Kansas courts have considered the non-highway vehicle exemption as an exemption from § 8-127(a) and § 8-135. *See, e.g.*, *Lemen*, 2012 WL 4795637, at *7–8; *In re Ramsey*, No. 02-14044-7, ADV. 02-5305, 2004 WL 2187178, at *4 (Bankr. D. Kan. Apr. 12, 2004); *In re Reed*, 147 B.R. 571, 574 (D. Kan. 1992). Reading the non-highway exemption this way also comports with *Kresyman*'s mandate to read the registration statute, § 8-127, in conjunction with the unlawful acts statute for vehicle registration, § 8-142. *See Kresyman*, 623 P.2d at 526. Section 8-142 makes it illegal to operate a vehicle on any highway in Kansas without registering it but specifically provides that § 8-142 is "subject to the exemptions allowed in K.S.A. 8-135, 8-198, and 8-1751a, and amendments thereto." So, a non-highway vehicle under § 8-198(a) is exempt from registration and the owner is not liable under § 8-142 for failing to register such a vehicle.

"that the vehicle be 'not manufactured for the purpose of using the same on the highways of this state' *and* 'not provided with the equipment required.'" *Lemen*, 2012 WL 4795637, at *7.

Here, United has shown that the Buggy met the second half of this two-part test, *i.e.*, that it was not provided with the equipment necessary to drive legally on Kansas roads. As discussed in Part A above, the absence of lights, turn signals, and mirrors prevent the Buggy from complying with the state's vehicle-safety laws, making the Buggy unfit for use on public roads. Kan. Stat. Ann. §§ 8-1705–06, -1708(b), -1740. So, United has shown that the Buggy meets one part of the non-highway vehicle test.

Only one Kansas case has considered the first half of the two-part test, *i.e.*, whether a motor vehicle was "not manufactured for the purpose" of highway travel. In *Lemen v. 21st Century National Insurance Co.*, the Kansas Court of Appeals held that it could not determine from the record presented whether a 1995 Yamaha YZ250 was manufactured for non-highway use. 2012 WL 4795637, at *8.[3] There, the Court of Appeals had been asked to review a summary judgment decision. *Id.* at *1. The parties agreed that the Yamaha did not have "headlights, tail lights, brake lights, side-view mirrors, rear-view mirrors, turn signal or windshield." *Id.* The parties also had provided the court with a photo of the Yamaha, but nothing more. *Id.* at *7. The Kansas court held that the Yamaha met the second part of the *nonhighway vehicle* definition found in § 8-197, but that it could not determine from just one photo whether the Yamaha had been manufactured for non-highway use. *Id.* at *8. So the court remanded the case for further proceedings. *Id.*

Here, as in *Lemen*, the summary judgment record is somewhat limited. The only evidence submitted in the summary judgment record is a series of photos. But unlike *Lemen*, the

---

[3] The court in *Lemen* did not interpret the Kansas Automobile Injury Reparations Act's definition of *motor vehicle*. Instead, it interpreted the insurance policy's definition. *Lemen*, 2012 WL 4795637, at *7. The insurance policy's definition of *motor vehicle*, however, was identical to the portions of the Act's definition that are relevant here.

photos here provide enough facts for the court to hold that no reasonable jury could find that the Buggy was manufactured for highway use.  The undisputed facts establish that the Buggy lacked lights, a windshield, turn signals, and mirrors.  The Buggy's operator stood on an unenclosed compartment.  No reasonable jury could associate such a vehicle with highway use.  These undisputed facts differ materially from the motorcycle at issue in *Lemen*.



Above: One of seven photos of the Buggy United
submitted here as part of the summary judgment record.

In Part A above, the court concluded that the Buggy was designed for use off of public roads.  Although *designed* and *manufactured* are different terms, they are not so different so as to preclude the court from concluding that the Buggy was not manufactured for use on highways for the same reasons the court found that it wasn't designed for highway use.  Based on the uncontroverted facts in this case, and even when viewed in the light most favorable to plaintiffs, no reasonable jury could find that the Buggy was manufactured for highway use.[4]  Thus, undisputed facts thus establish that the Buggy meets both parts of the non-highway vehicle test.

United has shown that the Buggy is a non-highway vehicle under § 8-198 and that it is not subject to registration in Kansas.  This means that the Buggy is not a *motor vehicle* as the Kansas Automobile Injury Reparations Act defines the term.[5]  Because the Buggy is not a *motor vehicle* under the Act, it is not subject to Kansas's compulsory-insurance law.  Thus, no reasonable jury could find the Buggy to be an auto under section V, part B.2 of the Business Endorsement.

---

[4] The court is not persuaded by plaintiffs' reliance on *Estate of Dutkiewicz v. Benchmark Insurance Co.*, No. 102,469, 2010 WL 2545668, at *5 (Kan. Ct. App. June 11, 2010).  Doc. 44 at 17.  In *Farm Bureau Mutual Insurance Co. v. Kurtenbach*—a first-party insurance case similar to this one—the Kansas Supreme Court considered whether a motorcycle was exempt from registration as an implement of husbandry under § 8-128(a)(1).  961 P.2d at 58–59.  Though the motorcycle was not exempt under § 8-128(a)(1), the court never expressed any doubt that an exemption from registration would mean that a vehicle is not the type of vehicle that is required to be registered in Kansas.  *See id.*  In *Kresyman*—a case plaintiffs rely on heavily—the Kansas Court of Appeals stated that "[v]arious other statutory provisions within the motor vehicle laws and the act provide exceptions and exemptions [to registration] but they play no role in this case," indicating that had an exception applied, the court's holding could have been different.  623 P.2d at 526.  Plaintiffs also cite *Lemen*, a case where the Kansas Court of Appeals specifically stated that if the vehicle there had met the definition of *nonhighway vehicle* found in § 8-197, "then it is 'of a kind' of vehicle *not* required to be registered in Kansas." 2012 WL 4795637, at *8.  And in May 2016, our court found that an all-terrain vehicle is exempt from registration in Kansas and therefore held that the all-terrain vehicle at issue in the case was not subject to Kansas's compulsory-insurance laws.  *Gonzalez*, 2016 WL 2736083, at *3–4.

[5] The parties spend most of their briefs discussing whether the Buggy was used in a manner that required registration.  But, the Buggy's use does not matter here.  All that matters is whether the Buggy is the *kind* of vehicle that must be registered.  This is so because the Kansas Automobile Injury Reparations Act only applies to "self-propelled vehicle[s] of a *kind* to be registered in the state."  Kan. Stat. Ann. § 40-3103(m) (emphasis added); *see also Lemen*, 2012 WL 4795637, at *8 (noting that use did not affect coverage).

### C.     Conclusion

Coverage under R.A. Knapp's policy with United requires admissible evidence from which a reasonable jury could find that Curtis Harlan occupied a motor vehicle designed for use on public roads or a motor vehicle subject to Kansas's compulsory-insurance laws.  Plaintiffs have failed to adduce evidence that could support a finding that the Buggy was either one.  As a consequence, and as a matter of law, the court holds that Curtis Harlan was not an insured under the Uninsured Endorsement of the Policy at the time of his death.  The court thus grants United's Motion for Summary Judgment.

### IV.     The Parties' Evidence Objections

The analysis in Part III disposes of the substance of United's Motion.  But the court continues so that its analysis will specify the source of the uncontroverted facts it relied on to make its decision.

The court made its decision without considering United's Exhibits C and G.  Plaintiffs objected to Exhibit C, arguing that United had not authenticated it, and Exhibit G, arguing that it was irrelevant.  These evidentiary controversies presented close questions but, in the end, plaintiffs had the better end of the argument and so the court did not consider United's statements of fact that relied solely on United's Exhibits C and G.  The following sections explain the court's reasoning for these conclusions.

### A.     Plaintiffs' Objection to Exhibit C:  The OSHA Report

Plaintiffs contend that United's statements of fact in paragraphs 7–10, and 21 are controverted because the document that United describes as an OSHA report—United's Exhibit C—was not authenticated or supported by a corroborating witness.  Not every authentication requires a corroborating witness, *United States v. Samuels*, 493 F.3d 1187, 1192 n.7 (10th Cir.

2007), but authentication is an essential prerequisite for admitting a document into evidence at trial and for a court to consider it at summary judgment, *Powers*, 206 F. Supp. 2d at 1103.

Here, United did not attach an affidavit attesting to the authenticity of the purported OSHA report to its Motion, Memorandum in Support, or Reply. *See* D. Kan. Rule 56.1. Thus, United must authenticate the report by "provid[ing] citations to the relevant portions of the deposition testimony that authenticates the exhibit[]." *Getz v. Bd. of Cty. Comm'rs of the Cty. of Shawnee*, 194 F. Supp. 2d 1154, 1157 n.1 (D. Kan. 2002); D. Kan. Rule 56.1; Fed. R. Civ. P. 56(c)(1)(A). United has failed to do so.

United argues that it authenticated Exhibit C as a public record under Federal Rule of Evidence 901(b)(7) by Mr. Haslar's deposition testimony "acknowledg[ing] that he was interviewed for the OSHA [r]eport and that he received a copy of it once the OSHA investigation was complete." Doc. 45 at 8. To meet Rule 901(b)(7)'s requirements, United must do more than show that OSHA is authorized by law to create reports like that in Exhibit C. United must show that the report "was in fact recorded or filed in a public office." 31 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 7112, at 125 (2000); *see also Amoco Prod. Co. v. United States*, 619 F.2d 1383, 1391 n.7 (10th Cir. 1980) (explaining that a record in a government agency's files is not necessarily a public record and remanding to allow proponents of the record to establish the document's provenance). Nothing in Mr. Haslar's deposition testimony establishes that a public office ever recorded or filed United's Exhibit C. *See* Haslar Dep. 41:18–42:2, 43:9–14, Doc. 45-2 at 11 (stating that Mr. Haslar received a copy of OSHA's report sometime after the accident and his termination from R.A. Knapp but not saying from where he received it). United has not authenticated Exhibit C under Rule 901(b)(7).

United next contends that portions of Mr. Haslar's deposition testimony authenticate Exhibit C under Rule 901(b)(1).  But neither the portions cited by United nor the rest of Mr. Haslar's deposition testimony authenticates United's Exhibit C.  Mr. Haslar testified that he had received a report from OSHA—marked Deposition Exhibit 3—but he never testified that the report submitted as United's Exhibit C is the OSHA report he recalled receiving.  And, Mr. Haslar never testified at his deposition that Deposition Exhibit 3 was a fair and accurate representation or copy of the OSHA report he had received.  *See United States v. Phillips*, Nos. 06-10001-01-WEB, 06-10001-02-WEB, 2007 WL 1289875, at *11 (D. Kan. May 1, 2007) (admitting documents because proponent established that the photocopies admitted at trial "reliable and accurately reflected the contents of the original[s]"), *rev'd in part on other grounds*, 543 P.3d 1197 (10th Cir. 2008).  So, even though Mr. Haslar might have the requisite knowledge of the OSHA report, his deposition testimony never established that United's Exhibit C is an OSHA report.

Though United did not invoke Rule 901(b)(4), the court considers whether United's Exhibit C can be authenticated under that rule.  Rule 901(b)(4) allows authentication of a document by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the[document], taken together with all the circumstances."  "OSHA" does not appear anywhere within or on the report in United's Exhibit C.  The name of the person preparing the report is not listed anywhere within or on United's Exhibit C.  No one signed Exhibit C and no deposition exhibit sticker is affixed to Exhibit C.  And Exhibit C does not bare a sufficient seal to self-authenticate the document under Rule 902.  In sum, United's Exhibit C contains no distinctive characteristics that would allow the court to find it authentic under Rule 901(b)(4).

United bears the burden to point to portions of the summary judgment record that authenticate Exhibit C. The portions of this record that United cites fail to do so. Therefore, the court concludes that United has failed to authenticate its Exhibit C in some fashion that leads to admissibility. The court thus disregarded all portions of United's statements of fact that relied solely on United's Exhibit C when arriving at its decision in Part III above. *See, e.g.*, *Boldridge v. Tyson Foods, Inc.*, No. 05-4055-SAC, 2007 WL 846517, at *1 (D. Kan. Mar. 20, 2007) (disregarding "all factual allegations supported by reference to plaintiff's exhibit" that wasn't properly authenticated); *Getz*, 194 F. Supp. 2d at 1157 n.1 ("The [c]ourt will disregard those summary judgment exhibits which the parties have failed to properly authenticate.").

### B.  Plaintiffs' Objection to Exhibit G:  Buggy Manual

Plaintiffs also contend that United's statements of fact in paragraphs 16–19 are controverted because one of the three sources of evidence United uses to support those facts does not reference the Buggy specifically. That source is United's Exhibit G, a user's manual and promotional materials for other power buggies.

The court construes plaintiffs' objection as a relevance objection. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

Here, the question is not whether all power buggies are autos under the Policy, but whether the buggy at issue in this case is an *auto* in the sense that the Policy defines that term. User's manuals and promotional materials for other power buggies are not helpful to a jury tasked with determining whether the Buggy is an auto. *See, e.g.*, *Echevarria v. Caribbean Aviation Maint. Corp.*, 841 F. Supp. 2d 585, 588 (D.P.R. 2012) (excluding notices concerning

bolt malfunctions from helicopter companies other than defendant because "[w]arnings by other companies, some of which are generally worded, are not helpful for the jury in determining whether [defendant's] helicopter was defective" (citing Fed. R. Evid. 401)); *In re Motor Fuel Temperature Sales Practices Litig.*, Nos. 06–2582–KHV, 07–2053–KHV, 07–1840–KHV, 2012 WL 3611010, at *6 (D. Kan. Aug. 22, 2012) (excluding evidence based on model industry rules that had not been adopted in Kansas because the case only dealt with model industry rules that Kansas had adopted).

United's Exhibit G also does not tend to make it more or less probable that the Buggy was an auto. Exhibit G includes a user's manual for a Multiquip buggy manufactured after January 2011 and promotional materials for Morrison, Stone, and Indy buggies. The buggy in this case is a Compact Technologies product. Doc. 41-5 at 6. The powered buggies featured in United's Exhibit G even look different than the Buggy. *Compare* Doc. 41-5 at 7, 69, 73, 75, *with* Doc. 41-6. The buggies shown in Exhibit G feature a dump bucket but the buggy at issue here features only a platform. Because the buggies featured in United's Exhibit G are different than the buggy in question here, Exhibit G does not have the tendency to make it more or less probable that the Buggy is an auto.

The court thus concluded that United's Exhibit G is not relevant and thus is inadmissible. The court, therefore, disregarded all portions of United's statements of fact that relied solely on United's Exhibit G when arriving at its decision in Part III above.

### C.   Conclusion

Even if the court had considered United's Exhibits C and G, its decision would not have changed. Those exhibits serve only to reinforce the court's ultimate decision. For instance, United's Exhibit G states, "[t]he MQ Whiteman Power Buggy . . . [is] intended for the

transportation of concrete, concrete spreading and spot pouring" and that the power buggy only has a 11.7-horsepower engine.[6]  Doc. 41-7 at 15.  Both of these facts, if considered, merely would have strengthened the court's conclusion that the Buggy was not manufactured or designed for use on public roads.  The facts supported by United's Exhibit C similarly support the court's ultimate decision.

      **IT IS THEREFORE ORDERED BY THE COURT THAT** United's Motion for Summary Judgment (Doc. 40) is granted.

      **IT IS SO ORDERED.**

      **Dated this 20th day of September, 2016, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

[6] For comparison, a 2017 Toyota Prius has a 95-horsepower engine.  *Features & Specs*, Toyota, http://www.toyota.com/prius/2017/features/mechanical_performance/1223/1224/1225/1226 (last visited Sept. 12, 2016).